UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SUSAN BORLAND,

               Plaintiff,

      v.                                                    Case No. 10-C-0092

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration,

               Defendant.

## DECISION AND ORDER

Plaintiff Susan Borland (hereinafter "Plaintiff" or "Borland") seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") under Title II and Supplementary Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 405(g). In her application for DIB, Plaintiff claimed that ongoing knee problems limited her ability to work. (Tr. 106.) After the Social Security Administration denied her applications initially and upon reconsideration, Plaintiff requested a hearing.

On August 10, 2009 Administrative Law Judge Mary L. Everstine (hereinafter "ALJ") conducted a hearing at which Borland, represented by counsel, appeared and testified. Based upon her testimony, the testimony of a vocational expert, and the medical evidence presented, the ALJ concluded in a September 3, 2009 decision that Plaintiff did not have an impairment or combination of impairments qualifying her for benefits. The ALJ opined that Borland retained the residual functional capacity ("RFC") to "perform sedentary work as defined in 20 CFR 404.1567(a) except

the claimant needs to occasionally stretch her right leg out; and, she is unable to walk on uneven terrain." While Plaintiff was unable to perform her past relevant work, the ALJ concluded she could perform other gainful employment. (Tr. 11-14.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review.

Borland argues that the ALJ failed to comply with the Social Security Administration's Ruling governing determination of a claimant's RFC, failed to properly assess credibility, failed to pose an appropriate hypothetical question to the vocational expert, and failed to fully develop the record at step five of the sequential evaluation process. Having fully reviewed the record, this Court concludes that the case must be remanded because the ALJ mischaracterized a treating physician's opinion concerning Borland's physical limitations in formulating her RFC. Accordingly, the decision of the Commissioner will be reversed and the case remanded for further proceedings.

## BACKGROUND

Borland applied for Social Security Disability benefits on August 21, 2007, stating that her disability began on June 13, 2003. (Tr. 8, 37.) At the time of the hearing before the ALJ, Borland was 46 years old. (Tr. 37.) She has two grown sons and two step-children. She is married and her husband has a full-time job. (Tr. 181.) She is a high school graduate (*Id.*) and has taken a course to become a certified nursing assistant. (Tr. 37.) Borland worked full-time as a head cook for Smuckers food company for twelve years (1991 to 2003). (*Id.*) She went on medical leave in June 13, 2003, citing continued pain from a 2001 knee injury. Between 2003 and her 2009 she did not work, except for a part-time job in 2006 working as a preparation cook at the Blind Pig restaurant where she earned approximately $6,000. (Tr. 10.) Borland is 5' 1" tall and weighs approximately

220 pounds.  (Tr. 43.)  Borland applied for Social Security benefits on September 9, 2007 and was denied initially and upon reconsideration.  (Tr. 54-79.)  She then requested a hearing.

## I. Borland's Testimony

Borland, represented by counsel, appeared and testified at the August 10, 2009 hearing. (Tr. 36.)  Borland testified that prior to 2003, she worked as a head cook at Smuckers, a position she held for twelve years.  (Tr. 38.)  She noted that the job was very physical, at times requiring her to lift up to 100 pounds. After her injury, Smuckers paid some of her medical bills and she received short and long term disability until those benefits ended.  (Tr. 39.)  Borland testified that Smuckers would not allow her to continue to work at the factory in light of her physical restrictions.  (Tr. 38-39.)   In 2006, while working as a part time prep cook at the Blind Pig, Borland continued to experience pain in her knee.  (Tr. 45.)  If she worked too hard or "overdid" it one day she would feel pain for the next two days.  (*Id.*)  Eventually she stopped working there.  Borland testified that she then tried looking for other jobs but could not find anything.  (Tr. 47.)

Borland testified that she has had five surgeries on her right knee.  (Tr. 39.)  Her most recent surgery was in February 2009.  This surgery gave her some relief and allowed her to move her knee whereas before it had been immobilized.  (Tr. 43.)  Despite these five surgeries Borland still claims she has ongoing problems with her right knee.  According to Borland, her only option is to have a knee replacement but she has been advised to wait seven years before she has the surgery because of the severe infection she contracted during a previous surgery.  (Tr. 40.)  She had been told that an infection can remain dormant for seven years and expressed concern that surgery could lead to

3

further infection (*Id.*)  Borland also stated that her age factored into her decision not to have surgery on her right knee.  Borland testified that the cartilage in her right knee is "totally destroyed." (*Id.*)

Borland testified that in the past she has taken anti-inflammatory and pain medicine, including Vicodin and Oxycontin.  The pain medication alleviates her pain but make her very sleepy, and she is therefore reluctant to take it.  She describes the sleepiness as being in "Neverland". (Tr. 42.)  She testified that after the February 2009 surgery she no longer needed to wear a leg brace.  (Tr. 43.)  She does not use a cane because she feels she is too young for a cane. (Tr. 46.)

Borland also testified about her activity level.  She does the laundry and makes meals for her family.  (Tr. 43*.*)  She lives in a ranch style home and the laundry is on the main floor allowing her to avoid stairs.  She testified that she used to hike, cross-country ski, and cut firewood but that her knee pain prevents her from participating in those activities.  (Tr. 46.)  Borland stated her pain and disability have caused her some depression and sadness.  (*Id.*)  She testified that she could lift a gallon of milk with one hand but that if she lifted the gallon of milk "all the way up" she would feel pressure and pain.  (Tr. 47.) Borland testified that her knee led to problems with sitting for any length of time and with standing for any length of time.  She claims that her leg cramps up suddenly and that sometimes she needs to stand and other times she needs to sit.  (Tr. 41.)  Borland testified that she could sit for a half-hour to an hour at a time.  (*Id.*)  She had difficulty walking over uneven surfaces and experienced pain not just in her right knee but in her right leg as well.  (Tr. 44.) Borland testified that she experienced pain at all times and was up frequently at night.  When her knee hurts she lays on the couch and puts a pillow underneath it.  (Tr. 45.) She testified that she will remain in this position for up to an hour.  (*Id.*)

4

## II. Medical Documentation

Medical documentation in the administrative record covers the period between 2002 and 2009. (Tr. 400-401.)

Borland reported that her knee problems began on June 1, 2001 when she twisted her right knee while stepping over an 18 inch high foot pump which was on the floor. (Tr. 321.) Dr. Jones at Berlin Medical Center in Berlin, Wisconsin, performed two arthroscopic procedures on Borland. She had an arthroscopic procedure on October 23, 2001. (Tr. 398.) She returned to full duty at Smuckers within four weeks. (Tr. 321.) Records reveal that Borland again had arthroscopic knee surgery at Berlin Memorial Hospital on August 13, 2002. (Tr. 216, 316, 321.) On August 30, 2002 she was admitted to the emergency room for pain and drainage related to an infection apparently contracted during her knee surgery. She had another arthorosopy on August 31, 2002 for irrigation and debridement of inflammatory tissue secondary to sepsis. (Tr. 216-17.) On September 13, 2002 she had an MRI that ruled out a torn meniscus. (Tr. 219.) In October 2002 Borland returned to work at Smuckers but reported to her physical therapist that after four hours of working she experienced pain and stiffness. (Tr. 274.) On April 22, 2003 Borland saw Dr. Richard Illigen at the University of Wisconsin for continued right knee pain. (Tr. 327.) He advised her that total joint replacement would be a poor option, that she should lose weight, and consider vocational retraining. Dr. Illigen opined that the knee would not take prolonged periods of weight bearing and stair climbing in the future. (*Id.*) On June 27, 2003 Borland underwent another right knee arthroscopic procedure with debridement of degenerative arthritis. (Tr. 302, 309.) She took a month off of work to recover. (Tr. 304.) On July 8, 2003 Borland reported that physical therapy had allowed her to

use a full range of motion in her knee but that she still had pain, especially when climbing stairs. (Tr. 306.)

On May 24, 2004 Dr. Jones saw Borland and noted that she was "potentially" a candidate for an upper tibial osteotomy. (Tr. 339.) On August 8, 2005 Dr. Jones reviewed x-rays of Borlands knees and recommended that her "restrictions should continue to be primarily a sitting job." (Tr. 338.) On September 27, 2007 Dr. Jones noted that Aleve helped Borland. (Tr. 354.)

On November 23, 2007 Borland saw Dr. Jankus who conducted a physical exam. He noted that she was taking 7.5 mg of Meloxicam, a nonsteroidal anti-inflammatory drug ("NSAID"), and rated her pain as a "3 or 4" out of 10. (Tr. 355.) She could extend both knees to neutral and flex her left knee without pain to 140 degrees. She experienced discomfort on flexing her right knee at 100 degrees and was limited to about 120 degrees total. Borland estimated that in an eight-hour day, she might be on her feet about half and off her feet the other half. (Tr. 357.) Dr. Jankus thought that was probably what she was doing and opined that she would be unable to tolerate activities that put direct pressure on her knee such as kneeling or crawling. (*Id.*) Dr. Jankus thought that Borland should be able to intermittently alternate her position up and down off her feet. (Tr. 355.)

On December 3, 2007 Dr. Sid Foster, a State agency medical consultant, completed a physical residual functional capacity assessment based on his review of Borland's file. (Tr. 358-365.) He checked specific boxes indicating Borland's exertional limitations, noting that she could occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk for at least two hours in an eight hour day and sit for about six hours in an eight hour day. (Tr. 359.) He also checked a postural limitation box, indicating that Borland should never crawl. (Tr. 360.) Dr. Foster's RFC

6

determination was affirmed by Dr. Michael Baumblatt, another State agency medical consultant, on April 29, 2008. (Tr. 377.)

On January 10, 2008 Borland saw Craig Batley, D.O. who rated her pain 4-5 out of 10. (Tr. 371.) On March 6, 2008 Borland again saw Dr. Craig Batley regarding hypertension, anxiety, and depression. (Tr. 369.) He noted that her anxiety with some depressive symptoms seemed to be controlled by Citalopram 40. On April 29, 2008 Borland's file was reviewed by Roger Rattan, Ph.D, an agency consultant, who concluded that she had depressive and anxiety symptoms but that she did not have severe psychiatric impairment. (Tr. 377, 380.)

As stated above, Borland's most recent knee surgery took place on February 2, 2009 when she underwent arthroscopic right knee surgery by Dr. Buck for loose body retrieval and right knee pain. (Tr. 395-397.) This surgery gave her some relief and allowed her to move her knee whereas before it had been immobilized. (Tr. 43.) Dr. Buck filled out a Social Security limitations form on August 6, 2009 in which he indicated that Borland could lift/carry/upward pull occasionally or frequently less than 10 pounds, stand/walk for less than 2 hours and sit continuously for about 6 hours. (Tr. 401.) On June 9, 2009 Borland saw Dr. Batley for a physical examination. He noted she was taking Citlopram, Hydrochlorothiazide, and Amlodpine and that her pain level, on a scale of 0 to 10, was a 0. Overall, she was "doing quite well." (Tr. 410-411.)

## III. ALJ's Decision

Based upon the medical record of evidence and the testimony adduced at the hearing, the ALJ applied the familiar five-step sequential evaluation process mandated by the Social Security regulations. *See* 20 C.F.R. § 404.1520. She found first that Borland was currently unemployed.

At step two, the ALJ found that Borland had the following medically determinable severe impairments: status post five surgical procedures to the right knee and obesity. (Tr. 10.) The ALJ then concluded that none of her impairments, alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that Borland had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant needs to occasionally stretch her right leg out; and she is unable to walk on uneven terrain." (Tr. 11.) At step four the ALJ found that Borland was unable to perform her past work, and thus proceeded to step five where she found that Borland was not disabled because she retained the RFC to perform a significant number of jobs that exist in the national economy.

In reaching that decision the ALJ also considered the testimony of a vocational expert, Elizabeth Cerezo-Donnelly. (Tr. 47.) The ALJ asked the vocational expert to assume a person of Borland's age, education and work experience was restricted to sedentary jobs as defined in the DICTIONARY OF OCCUPATIONAL TITLES and the Social Security Regulations and expressly should avoid stooping, crouching, crawling, and kneeling, avoid walking on uneven terrain, and should be able at the work station, to stretch the right leg out occasionally. Given these assumptions the vocational expert testified that there would still be a substantial number of jobs Borland could perform. She named three examples including a telephone order clerk, a surveillance system monitor, or a charge account clerk. (Tr. 48).

Plaintiff raises three major issues with the ALJ's determination: (1) the ALJ failed to properly assess Borland's physical and mental RFC; (2) the ALJ erred in her credibility analysis; (3) the ALJ failed to meet her burden at step five of the sequential evaluation. The Court will address each argument in order. First, it is necessary to set out the standard of review.

8

# STANDARD OF REVIEW

A district court's review of a social security appeal is limited to determining whether the ALJ's decision is supported by substantial evidence and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citation omitted). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). However, "[i]n coming to his decision . . . the ALJ must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Scheck*, 357 F.3d at 699 (citation omitted). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) (citation omitted). If the ALJ commits an error of law, however, reversal is required unless the error is found to be harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination). The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2003); *see also Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge from the evidence to the result.

*Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (citations omitted). While it is true that the ALJ's decision must reflect a fair assessment of evidence and be free of fatal gaps and contradictions, it is also true that a reviewing court must "give the opinion a commonsensical reading rather than nitpick[] at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

Finally, an agency's decision cannot be defended on grounds the agency did not rely on. This principle, known as the *Chenery* doctrine, is applicable to judicial review of disability determinations. *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). But this does not mean that the agency's lawyer is precluded from referring to evidence in the record that supports the ALJ's decision simply because it was not expressly cited by the ALJ. As noted above, the ALJ need not cite every shred of evidence supporting his findings in order for his decision to be upheld. It is only necessary that he demonstrate the path of his reasoning, not every step along that path. The standard is whether the decision is supported by substantial evidence in the record. It is the record the court is called upon to review, not merely the ALJ's written decision. Judicial review is not simply cite-checking the ALJ's decision. Citing evidence not mentioned by the ALJ to support findings the ALJ actually made is thus not the same as offering new grounds to support the ALJ's decision that the ALJ did not rely on. The latter is a violation of the *Chenery* doctrine. The former is part of what is required for judicial review.

## ANALYSIS

### I. The ALJ's Determination of Borland's RFC

As noted above, the ALJ found that Borland has the RFC to "perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant needs to occasionally stretch her right leg

out; and she is unable to walk on uneven terrain." (Tr. 11.) Sedentary work is defined in the cited

regulation as

> work which involves lifting no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job duties. Jobs are sedentary if
> walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 1567(a).

Plaintiff takes issue with this RFC determination arguing that the ALJ failed to assess

Borland's work-related abilities on a function-by-function basis as she was required to do by Social

Security Ruling (SSR) 96-8p. (Plaintiff's Br. at 11-12.) It is true, as Borland contends, that the

RFC should "identify the individual's functional limitations or restrictions and assess his or her

work-related abilities on a function-by-function basis, including the functions in ... 20 C.F.R.

§ 404.1545[ (b) ]," which include "sitting, standing, [and] walking." *See* S.S.R. 96-8p, 1996 WL

374184, at *1. But the failure to strictly comply with the ruling does not require reversal in every

case. *Zatz v. Astrue*, 346 Fed. Appx. 107,111 (7th Cir. 2009); *Knox v. Astrue*, 327 Fed. Appx. 652,

657 (7th Cir. 2009). The ruling cautions that a failure to make the function-by-function assessment

"could result in the adjudicator overlooking some of an individual's limitations or restrictions." *Id.*

Thus, in determining whether reversal is required, the court should look to see whether the ALJ

overlooked any of the claimant's physical or mental limitations or restrictions that make a

difference.

Borland raises two specific issues with the ALJ's RFC determination. First Borland

contends that the ALJ failed to properly take into consideration her obesity in determining her RFC.

She then argues that the ALJ failed to consider the combined effect of Borland's anxiety and

depression on her ability to work. Each will be addressed in turn.

## A) Obesity

Borland contends that the ALJ overlooked the limitations to her RFC resulting from her obesity. She seeks remand so the ALJ can "adequately discuss Plaintiff's obesity and its effect on her ability to perform even sedentary work." (Plaintiff's Br. at 15.) SSR 02-1p requires an ALJ to consider the exacerbating effects of a claimant's obesity on her underlying conditions (even if the obesity is not itself a severe impairment) when arriving at a claimant's RFC. But a failure to explicitly consider the effects of obesity may be harmless error. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). In *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004), for example, the ALJ did not specifically address the claimant's obesity but adopted "the limitations suggested by the specialists and reviewing doctors" who were aware of the condition. *Id.* In addition, the claimant failed to "specify how his obesity further impaired his ability to work." *Id.* Under these circumstances, the Court concluded any error was harmless because the claimant's obesity, though not specifically mentioned by the ALJ in fashioning the claimant's RFC, was factored indirectly into the ALJ's decision as part of the doctors' opinions." *Id.*

A similar argument could be made for disregarding the ALJ's failure to address Borland's obesity here if the ALJ had properly considered the limitations imposed by her treating physicians. After all, it is the functional limitation of the claimant that determines her RFC, regardless of the cause of the limitation, and Borland did not specify how her obesity further impaired her ability to work. Here, however, the ALJ misstated the opinion of one of Borland's treating physicians. Dr. Buck, who performed Borland's most recent surgical procedure of record in February 2009, filled out a form six months later in August 2009. Although the ALJ stated that Dr. Buck opined that she was capable of sedentary work, the Commissioner concedes that "there are discrepancies between

12

Dr. Buck's assessment and the definition of sedentary work." (Commissioner's Br. at 13.) For example, the definition of sedentary work requires an ability to lift up to 10 pounds. Yet, Dr. Buck checked a box on the Treating Physician Medical Source Statement indicating that Borland was incapable of lifting 10 pounds on even an occasional basis. (Tr. 401.) Dr. Buck also indicated on the form that Borland could sit continuously (with normal breaks) for "about six hours" in an eight-hour day and stand/walk (with normal breaks) for a total of "less than two hours." (*Id.*) Full-time work, however, assumes an eight-hour day. See SSR 96-8p ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."). If, as Dr. Buck indicated on the form, Borland can only sit for six hours and sit/stand for less than two hours, it would appear she is incapable of performing even sedentary work on a full-time basis.

The Commissioner appears to concede that the limitations listed by Dr. Buck are inconsistent with a sedentary work RFC, but argues that other evidence in the record supports the ALJ's finding that Borland was capable of at least sedentary work. The Commissioner notes, for example, that in 2003 Dr. Jones indicated Borland could lift up to thirty-four pounds occasionally and ten pounds continuously. (Br. at 13 (citing Tr. 333.)) In 2007, Dr. Foster indicated she could lift up to ten pounds on an occasional and frequent basis. (Br. at 13 (citing Tr. 359.)) Both Dr. Jones and Dr. Foster also opined that Borland could stand or walk for more than two hours. (Tr. 333, 359.) In light of this evidence and the absence of clarity and consistency in the various forms, the Commissioner argues that the ALJ's finding that Borland was capable of sedentary work should be upheld.

13

The difficulty with the Commissioner's argument in support of the ALJ's decision is that it does not track the ALJ's rationale for her decision. If the ALJ had rejected Dr. Buck's opinion because it was inconsistent with other medical source opinions that were better supported in the record, or because Dr. Buck performed the surgery on her knee and offered no documentation supporting his opinion on her upper extremity strength, her finding would be upheld. But that is not what the ALJ did. Instead of explaining why she rejected Dr. Buck's opinion that Borland's limitations were inconsistent with sedentary work, the ALJ misread his report and offered it as support for her RFC. Indeed, not only did the ALJ indicate that Dr. Buck's opinion was consistent with her finding that Borland was capable of sedentary work, but she also suggested that his opinion was entitled to greater weight because it was offered "AFTER her most recent surgery and AFTER she had reported in June 2009 that she had done well until a couple of weeks prior when she had some increased pain." (Tr. 14.) For this Court to scour the record to support a rejection of evidence the ALJ did not reject would be a violation of the *Chenery* doctrine. Given the ALJ's misreading of the report, the case must be remanded so that Dr. Buck's opinion can be properly assessed. Although remand is required for this reason alone, the Court will proceed to address the remaining issues raised by Borland for completeness.

**B) Anxiety and Depression**

Borland next argues that the ALJ "failed to consider the combined effect of Plaintiff's anxiety and depression on her ability to work." (Plaintiff's Br. at 16.) The ALJ found that "the claimant's medically determinable mental impairments of depression and anxiety, considered singly or in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." (Tr. 11.) It thus follows, as the ALJ

14

found, that Borland's mental impairments did not meet the Part C criteria of a listing. *See* 20 C.F.R. Part 404, subpart P, App. 1., § 12.01. Borland does not contest either of these findings. The ALJ also found, however, that Borland's mental impairments resulted in mild limitations of activities of daily living and of concentration, persistence and pace. (Tr. 11.) Then, two paragraphs later, the ALJ apparently contradicts herself by stating: "There is no indication in the record that the mental impairments would even minimally impact functioning." (*Id.*) Relying on ALJ's first finding of mild limitations which is supported by the state agency consultant's evaluation (Tr. 387), Borland contends that having found mild limitations in these two areas of function, the ALJ was required to include such limitations in her RFC. Her failure to do so, Borland contends, amounts to reversible error.

This seemingly hypertechnical argument has some appeal. The mere fact that a claimant's mental impairment is not severe does not mean it drops out of further consideration in evaluating the claim. SSR 96-8p explains that in formulating a claimant's RFC, the ALJ must consider all of the claimants functional limitations, even those that are not in themselves severe:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 374184, *5 (S.S.A.). Because the ALJ found some limitation caused by Borland's mental impairment, albeit mild, Borland argues it was error for her not to factor such limitation into the RFC.

The Seventh Circuit has held that a moderate impairment of a claimant's concentration, persistence and pace due to mental illness must be included in the RFC and in any hypothetical question posed to a vocational expert at step five of the evaluation. *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009). Here, however, the limitation on that function, as well as on Borland's activities of daily living, was only mild. In addition, as the ALJ also noted, Borland had received no specialized or sustained treatment for a mental illness, and her osteopath noted that her symptoms were adequately controlled with medication. Under these circumstances, the failure to specifically include such mild limitations in the RFC was not error. *See Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (holding that non-exertional limitations resulting from claimant's depression not sufficiently severe to preclude use of grid and require assistance of vocational expert).

## II.  ALJ's Credibility Analysis

Borland next contends that the ALJ failed to comply with SSR 96-7p and "Seventh Circuit mandates" in assessing her credibility. SSR 96-7p governs the ALJ's assessment of allegations of pain or other disabling symptoms. It requires the ALJ to follow a two-step process. First, she must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the alleged symptoms cannot be found to affect the claimant's ability to work. If, however, the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which the symptoms limit the claimant's ability to work. In making this second determination, the ALJ considers the entire record, including the claimant's daily activities; the location, duration, frequency and intensity

16

of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The Seventh Circuit has addressed the requirements of SSR 96-7p and the standard of review it employs in assessing the credibility of a Social Security disability claimant on many occasions:

> Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." In this regard it is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.* It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

*Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). At the same time, "[t]he requirement that the ALJ articulate his consideration of the evidence is deliberately flexible." *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir. 1992). The "ALJ need not provide a complete written evaluation of every piece of testimony and evidence." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995). Moreover, an ALJ's credibility determination is viewed with deference because the ALJ, not a reviewing court, is in the best position to evaluate credibility. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)). A reviewing court will reverse the ALJ's

17

credibility determination "only if it is so lacking in explanation or support that we find it 'patently wrong.'" *Id.* (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

In this case, upon comparing Borland's testimony at the administrative hearing to the medical records, the ALJ concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 13.) In support of this conclusion, the ALJ first noted that the objective medical evidence of record does not support Borland's testimony concerning the intensity, persistence and limiting effects of her symptoms. (Tr. 13.) The ALJ stated that "no determination of a residual functional capacity limitation was made by any qualified treating physician that would limit the claimant to the degree asserted by the claimant." (Tr. 13.) While the ALJ may not reject a claimant's testimony regarding the severity and extent of pain at the second step of the SSR 96-7p analysis based solely on the absence of medical evidence, this does not mean that the absence of medical evidence is not a factor to be considered. Indeed, SSR 96-7p explicitly states that "the medical signs and laboratory findings, [and] the individual's own statements about the symptoms . . . " are among the evidence the ALJ must consider in assessing the claimant's credibility at the second step of the process. SSR 96-7p, 1996 WL 374186 *2.

The ALJ also noted that while the record revealed that Borland had several knee surgeries, "there are no references the claimant reported pain or limitation as severe as alleged." (Tr. 14.) The ALJ noted that in July 2003 "the claimant reported that she was not taking any pain medications or supplements" and was "not wearing a brace or using an assistive device." (Tr. 14.) The ALJ further

18

notes that Borland exhibited a full active range of motion in September 2003. Further weighing against Borland's testimony as to the limiting effects of her knee pain is her own report in August 2005 that Aleve helped her knee pain, a point noted by the ALJ, and her June of 2009 self report reported that she was doing quite well. (Tr. 13-14.) By including such analysis in her opinion the ALJ appropriately built a logical bridge between the evidence and the resulting credibility determination.

In sum, the evidence in the record here is sufficient to support the ALJ's finding that Borland was not a credible witness as to the intensity, persistence, and limiting effects of her symptoms. The ALJ's articulation of her reasons for disbelieving her account of her symptoms is sufficient to allow the Court to follow her reasoning and to see the consistency between the ALJ's credibility determination and the evidence of record. *Nelson v. Apfel*, 131 F.3d 1228, 1237-38 (7th Cir. 1997). Rather than offer mere boilerplate or an empty recitation of the factors she was to consider, the ALJ referenced specific facts in the record that demonstrated the path of his reasoning. In light of the deference owed the ALJ, no more is required.

Finally Borland takes issue with the ALJ's assessment of her daughter-in-law's credibility. (Plaintiff's Br. at 21.) In 2008 Borland's daughter-in-law submitted a third-party function report in support of Borland's disability claim. (Tr. 141-149.) The ALJ devoted a full paragraph of her decision to this report, applied appropriate credibility factors, and found that the report was "not fully credible." (Tr. 12.) Thus the ALJ properly confronted evidence that did not support her conclusion and explained why it was rejected Even if Borland's daughter-in-law's report had been found credible, it tends to undercut – rather than bolster – Borland's own representation of her limitations. The daughter-in-law's report describes Borland feeding and watering her dog,

shopping, driving, cleaning, caring for older foster children, making dinners every night, and floating in the pool. Insofar as such activities require walking, sitting, bending over, standing, and climbing into and out of a pool they are quite possibly inconsistent with Borland's testimony concerning her physical limitations.

## III. Step Five

Borland's third and final argument for remand relates to the ALJ's assessment at step five of the sequential evaluation process. In general an ALJ must orient the vocational expert to the totality of a claimant's limitations. *Louquetta O'Connor-Spinner v. Michael Astrue,* --- F.3d ---, 2010 WL 4812819. *3 (7th Cir., 2010) (collecting cases). This is often done through a hypothetical question the ALJ poses to a vocational expert. *Id.* Here Borland claims the ALJ's hypothetical question posed to the vocational expert was improper. She contends that the hypothetical question did not incorporate all of her limitations.

As already explained above, the Court has concluded that the ALJ misread Dr. Buck's report and the case must be remanded to redetermine Borland's RFC. If on remand the RFC changes, a different hypothetical question will be posed to a vocational expert. In the event the RFC remains the same, however, it will be useful to address the other objections to this step of the process Borland has raised.

Borland complains that the ALJ asked the vocational expert to consider an individual who should *avoid* crawling. (Tr. 48) Borland contends, however, that the vocational expert needed to consider an individual who should *never* crawl. (Plaintiff's Br. at 13 and 22.) Likewise Borland argues the ALJ should have asked the vocational expert to consider an individual who "should never

kneel", who "should intermittently alternate position up and down off her feet", who "would be able to stand/walk less than two hours and sit for six hours in an 8-hour workday with no squatting, kneeling or climbing." (Plaintiff's Br. at 22.)

While it may have been better for the ALJ to say "never" instead of "should avoid" her intent is clear and unmistakable. It is nearly inconceivable that the vocational expert would have changed her opinion had the ALJ posed the hypothetical question in terms of "never crawling" as opposed to "should avoid" crawling. Moreover the sedentary work positions identified by the vocational expert do not involve crawling. It is hard to imagine a situation where a telephone order clerk, surveillance system monitor, or charge account clerk would be required to crawl as part of their job duties. (Tr. 48).

The ALJ's hypothetical question included the requirement that the person "should be able, at the work station, to stretch the right leg out occasionally, but can do that while sitting in the, at the work station, so just extending the leg". This limitation is supported by the medical evidence of record. While Borland claimed that her RFC was more limited, the ALJ rejected her testimony and concluded that the ability to "stretch her right leg out occasionally" would adequately account for her additional limitation.

Finally, Borland contends that the ALJ improperly failed to ask the vocational expert whether her opinions were consistent with the *Dictionary of Occupational Titles* ("DOT"). (Plaintiff's Br. at 22.) This argument fails because the ALJ specifically asked the vocational expert to base her testimony on the DOT. (Tr. 48-49.) Borland argues that there was an apparent conflict between the vocational expert's testimony and the DOT and, therefore, the ALJ had a duty to conduct further inquires of the vocational expert. (Plaintiff's Br. at 22.) But based on the medical

21

documentation of record and Borland's testimony, there was no apparent conflict. *See Overman v. Astrue,* 546 F.3d 456 (7th Cir. 2008) (ALJ only has to conduct further inquiry when conflicts between vocational expert and DOT are so obvious that ALJ should have picked up on them without assistance). Even Borland's own attorney at the hearing did not raise purported conflicts between vocational expert's testimony and the DOT. (Tr. 49-50.) Borland attempts to create a conflict by asserting that the three jobs recommended by the vocational expert – telephone order clerk, surveillance system monitor, and charge account clerk – "certainly could not be performed" by Borland because such jobs require a reasoning level of "3". (Plaintiff's Br. at 23.) According to Borland, a conflict arose when the vocational expert classified the three jobs as unskilled. This does not create a conflict for several reasons. First, Borland presented no evidence or testimony regarding her ability or inability to do skilled work and the ALJ appropriately did not factor such limitations into the hypothetical question. Borland's work as a head cook for twelve years at Smuckers indicates that she has the cognitive ability to perform the three jobs identified by the vocational expert. The ALJ noted that the main reason Borland could not perform her prior job as a head cook – a skilled job – had to do with exertional levels. (Tr. 14.) There is no indication on this record that Borland's cognitive ability changed or diminished between 2003 and 2009. Moreover Borland presents no authority for the inference that a job requiring a reasoning level of "3" is skilled rather than unskilled.

For all of these reasons the ALJ's actions at step five of the sequential evaluation process were appropriate. Her hypothetical question included all of Borland's key limitations. And there was no apparent conflict between the vocational expert's testimony and the DOT.

## CONCLUSION

Although Borland has asserted numerous claims of error, the Court concludes only one is of such merit to require reversal. The ALJ misstated the opinion of a treating physician as to Borland's physical limitations and relied upon such misstatement is formulating her RFC. Accordingly, the Commissioner's decision is reversed and the case is remanded pursuant to 42 U.S.C. § 405(g) (sentence four) for further proceedings consistent with this decision.

**SO ORDERED** this ___16th___ day of December, 2010.

         s/ William C. Griesbach
William C. Griesbach
United States District Judge